UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ELEC-TECH INTERNATIONAL (H.K.) CO. LIMITED,<br><br>    Plaintiff<br><br>  v.<br><br>EURO-PRO OPERATING LLC,<br><br>    Defendant. | CIVIL ACTION<br>NO. 13-13162 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION TO ENJOIN ARBITRATION**

  By commencing arbitration against Plaintiff Elec-Tech International (H.K.) Co. Limited ("ETI Hong Kong"), Defendant Euro-Pro Operating LLC ("Euro-Pro") seeks to manufacture jurisdiction in the American Arbitration Association ("AAA"), while circumventing jurisdiction in a court of the People's Republic of China ("PRC"), where a first-filed lawsuit arising from the same dispute is pending. Any claim that Euro-Pro has arises from its business relationship with Elec-Tech International Co. Limited ("Elec-Tech"), a PRC company that agreed to manufacture certain home appliances for Euro-Pro. Three months ago, Elec-Tech sued Euro-Pro in the Zhuhai Intermediate People's Court for breach of contract by failing to pay invoices. Thereafter, Euro-Pro commenced arbitration against an Elec-Tech subsidiary, ETI Hong Kong. ETI Hong Kong, which Euro-Pro admits is distinct from Elec-Tech, is not a manufacturer and never agreed to arbitrate claims arising from the manufacturing of products for Euro-Pro. ETI Hong Kong asks this court to enjoin an arbitration before the AAA which has no jurisdiction over ETI Hong Kong or this dispute.

**STATEMENT OF THE CASE**

  Euro-Pro's arbitration, like Elec-Tech's Zhuhai action, arises from Euro-Pro and Elec-Tech's project to produce steam ovens and vegetable choppers. Euro-Pro is headquartered in

Massachusetts. It supplies cleaning products and home appliances to retail stores such as Wal-Mart and B.J.'s Wholesale Club, primarily in the United States and Canada. Verified Complaint ("Compl."), ¶ 8; Euro-Pro's Notice of Arbitration and Statement of Claim ("SOC"), ¶ 18. Euro-Pro outsources production overseas. Compl. ¶ 8; SOC ¶ 18. Elec-Tech, a leading manufacturer of home appliances, is headquartered in Zhuhai, Guangdong Province, PRC, home to a thriving manufacturing industry. Compl. ¶ 5. Elec-Tech manufactures products that are sold internationally and is listed on the Shenzhen Stock Exchange. *Id.*

Around 2012, Euro-Pro and Elec-Tech conducted discussions about a potential business relationship. Compl. ¶ 9. Elec-Tech agreed to manufacture for Euro-Pro a steam oven (Euro-Pro model numbers CO600 and CO650, as well as sub-models), related accessories; and a vegetable chopper (Euro-Pro model number QB900). *Id.* The parties never finalized their agreement in a writing. *Id.*

Elec-Tech and Euro-Pro worked on the project between January and July 2013. *Id.* ¶ 13. During that time, Euro-Pro generated a series of purchase orders for tooling and other machine parts that Elec-Tech would need to manufacture the products and for sample and display products. *Id.* Euro-Pro correctly issued the vast majority of its purchase orders, including the one that Euro-Pro attached to its Statement of Claim, to "Elec-Tech International," *i.e.*, Elec-Tech. *Id.* ¶ 14. Because of carelessness or other reasons best known to itself, Euro-Pro issued a small number of tooling purchase orders to an Elec-Tech subsidiary, ETI Hong Kong, even though Euro-Pro knew that Elec-Tech, as the manufacturer, was the entity that needed tooling for the project. *Id.* After receiving purchase orders from Euro-Pro, Elec-Tech caused its subsidiary, ETI Hong Kong, to issue invoices to Euro-Pro. *Id.* ¶ 15.

Elec-Tech and ETI Hong Kong are legally separate entities. Elec-Tech manufactures products out of a number of production facilities in industrial areas of the PRC. *Id.* ¶ 6. Elec-Tech employs thousands of people. *Id.* ETI Hong Kong, located not in the PRC but in Hong Kong, does not manufacture products. Rather, it provides primarily an administrative function. *Id.* ¶ 7. It employs a staff of about 10 and occupies space on the eighth floor of a prominent

commercial building in Kowloon, Hong Kong.  *Id.*  Elec-Tech engages ETI Hong Kong to provide billing and payable functions because regulatory, currency, and market conditions in Hong Kong are more facilitative of foreign trade.  *Id.* ¶ 12.

Throughout, Euro-Pro knew, or should have known, that its manufacturing dealings were with Elec-Tech.  Elec-Tech identified itself as the manufacturing entity to Euro-Pro in writing.  For example, in October 2012, as the parties prepared to launch the project, Euro-Pro asked Elec-Tech to complete a profile about its operations, products, and capacity.  *Id.* ¶ 10.  Elec-Tech completed and returned the form, identifying its full corporate name; correctly disclosing its address as No.1 Jinfeng Road, Tanjiawan Town, Xiangzhou District, Zhuhai City, Guangdong Province with manufacturing facilities in Zhuhai and Zhongshan. *Id.*

In November 2012, after Elec-Tech provided Euro-Pro with quotations for the steam oven prototypes, Euro-Pro asked Elec-Tech to fill out another form.  *Id.* ¶ 11.  Elec-Tech again identified itself as the contact and disclosed its Zhuhai address.  Elec-Tech designated ETI Hong Kong as the payee, consistent with the parties' understanding that invoices would be issued by ETI Hong Kong.  *Id.*

In January 2013, Euro-Pro asked Elec-Tech to identify a contact person for the parties' discussions about the details of the project.  *Id.* ¶ 16.  Elec-Tech designated Lacie Li, an Elec-Tech sales representative.  Her business card, of course, indicated that she worked for Elec-Tech in Zhuhai.  *Id.*  Elec-Tech also identified its website, http://www.electech.com.cn, which describes Elec-Tech's founding in Zhuhai, its listing on the Shenzhen Stock Exchange, and its production facilities in Zhuhai and throughout the PRC.  *Id.* ¶ 17.

Not only did Elec-Tech's correspondence make clear to Euro-Pro that Elec-Tech was the manufacturing entity, but Euro-Pro personnel visited Elec-Tech.  *Id.* ¶ 18.  *Euro-Pro sent some twenty employees to Elec-Tech's production facility in Zhuhai, for a number of visits, where they dealt directly with Elec-Tech personnel.  Id.*; SOC ¶ 36.

Euro-Pro demonstrated its knowledge that Elec-Tech was the manufacturing entity with which it dealt.  In December 2012, Euro-Pro arranged an agreement between Elec-Tech and a

third-party quality control service to test the merchandise coming out of production. Compl. ¶ 19. In May 2013, Euro-Pro wrote to Elec-Tech authorizing it to produce the CO600, CO650, and QB900 models. *Id.* ¶ 21.

On September 16, 2013, Elec-Tech sued Euro-Pro in the Zhuhai Intermediate People's Court to recover unpaid amounts owed to Elec-Tech and other damages resulting from Euro-Pro's breach of contract. *Elec-Tech International Co., Ltd. v. Euro-Pro Operating LLC*, [2013] Zhu Zhong Fa Min Si Chu Zi No. 10. Compl. ¶ 22. Euro-Pro objected to the Zhuhai court's jurisdiction by claiming that ETI Hong Kong, and not Elec-Tech, was the relevant contracting counterparty. *Id.* ¶ 23.

On November 6, 2013, Euro-Pro commenced the arbitration proceeding, *Euro-Pro Operating LLC v. Elec-Tech International (H.K.) Co. Limited*, case number 50 154 T 01059 13, before the AAA's International Centre for Dispute Resolution. *Id.* ¶ 24; SOC. Euro-Pro named ETI Hong Kong, and not Elec-Tech, as respondent. The Statement of Claim presented the flip-side of Elec-Tech's breach of contract claim in the Zhuhai action: it alleged that Elec-Tech failed to manufacture products that were acceptable to Euro-Pro and seeks some $18.5 million of damages. Compl. ¶ 28; SOC ¶ 1 (alleging failure to "produce merchantable kitchen products that were consistent with [Euro-Pro's] high quality standards and market reputation"), ¶ 4 (alleging failure to "comply with EP's design and technical specifications" and to "implement viable quality assurance and control procedures to ensure that both the materials and workmanship employed was [sic] free from defects"), ¶¶ 28-36 (alleging deficiencies in manufacturing).

No agreement generally to arbitrate disputes exists between Euro-Pro and ETI Hong Kong, and Euro-Pro's Statement of Claim did not assert otherwise. Compl. ¶ 26. Euro-Pro never executed a master agreement to govern the project. *Id.* ¶ 9. Moreover, on January 10, 2013, Elec-Tech objected to Euro-Pro in writing that the boilerplate terms and conditions, including a narrow arbitration clause, attached to Euro-Pro's first purchase order were "under discussion and not finalized yet." *Id.* ¶ 20.

In an attempt to generate AAA jurisdiction absent such an agreement, Euro-Pro

embroiled only ETI Hong Kong and relied upon the arbitration clause in the purchase order's boilerplate. That language states:

> At BUYER's option, if BUYER so elects in its sole discretion with regard to any particular dispute, *any dispute arising in connection with this P.O.* shall be resolved by arbitration in Boston, MA in accordance with the rules of the American Arbitration Association; and *all disputes shall otherwise be resolved in and only in federal or state court,* as is appropriate, in Suffolk County, MA.

SOC ¶ 13 (emphasis supplied).

But the purchase order was not an agreement for the manufacture of product generally (and did not even apply to the manufacture of product); ETI Hong Kong was never to be the manufacturer; and it never agreed to arbitrate all disputes which Euro-Pro might assert arising out of the manufacturing project with Elec-Tech. (Euro-Pro's boilerplate quoted above specifically refers to disputes being resolved in the state and federal courts sitting in Massachusetts.)

Euro-Pro's Statement of Claim conflated ETI Hong Kong with Elec-Tech. For example, Euro-Pro's Statement of Claim asserts that the dispute "aris[es] in connection with purchase orders" entered into between Euro-Pro and ETI Hong Kong. SOC ¶ 1. Yet, Euro-Pro issued the very purchase order attached to the Statement of Claim to "Elec-Tech International," the entity that had agreed to manufacture Euro-Pro's products, not to ETI Hong Kong. SOC at 19. Euro-Pro's Statement of Claim also refers to ETI Hong Kong's production facilities in the PRC because Euro-Pro knows that ETI Hong Kong has no production facilities and does not manufacture products.

## ARGUMENT

### A.   This Court Has the Power to Enjoin the Arbitration Proceeding.

Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which it has not agreed to arbitrate. *AT&T Techs. v. Comm'ns Workers of America*, 475 U.S. 643, 649 (1986). Whether the parties have agreed to arbitrate is to be decided by the court, not the arbitrator. *Id.*; *Awuah v. Coverall N. Am., Inc.*, 703 F.3d 36, 41 (1st Cir. 2012). If

A/75850926

the court finds that no agreement to arbitrate exists, Massachusetts and federal law both authorize the court to enjoin the arbitration proceeding.

The Massachusetts Uniform Arbitration Act for Commercial Disputes provides that "[u]pon application, a superior court may stay an arbitration proceeding commenced or threatened if it finds that there is no agreement to arbitrate." M.G.L. ch. 251, § 2. If the existence of an agreement to arbitrate is "in substantial and bona fide dispute," the court shall determine the issue "forthwith and summarily" and, should the court find for the applicant, the court "shall order a stay of arbitration." *Id.* This statute grants the same judicial powers and obligations federal courts exercising diversity jurisdiction. *Societe Generale de Surveillance SA v. Raytheon European Mgmt. & Sys. Co.*, 643 F.2d 863, 868 (1st Cir. 1981) (Breyer, J.) (the district court has authority under M.G.L. ch. 251, § 2, to enjoin Boston arbitration sought by Massachusetts corporation against a French corporation because the parties did not agree to arbitration in Boston).

The Federal Arbitration Act ("FAA") does not expressly grant the power to enjoin an arbitration proceeding where an agreement to arbitrate is absent; however, such an injunction "is the concomitant of the power to compel arbitration where it is present." *Societe Generale*, 643 F.2d at 868. Thus, the First Circuit has interpreted Section 4 of the FAA to grant both the power to compel arbitration and the power to stay arbitration. *Id.*; *PCS 2000 LP v. Romulus Telecommunications, Inc.*, 148 F.3d 32, 35 (1st Cir. 1998) (FAA, 9 U.S.C. § 4, authorizes a court both to compel arbitration and to stay arbitration, a "distinction without a difference"); *see also Am. Broad. Cos. v Am. Fed'n of Television & Radio Artists*, 412 F. Supp. 1077, 1082 (S.D.N.Y. 1976).

    **B.**    **The Arbitration Should Be Enjoined Because No Applicable Agreement to Arbitrate Exists.**

        **1.**    **The AAA Lacks Jurisdiction Over ETI Hong Kong in the Absence of an Agreement to Arbitrate the Dispute.**

Euro-Pro understands that Elec-Tech and ETI Hong Kong are legally distinct entities with different functions. Euro-Pro's challenge to the jurisdiction of the court in Zhuhai in the

case brought by Elec-Tech is based on the legal distinction between the two entities. Euro-Pro contests jurisdiction in the Zhuhai action by asserting that ETI Hong Kong somehow is the relevant counterparty. Compl. ¶ 24. The reason for Euro-Pro's position is its transparent attempt to oust the Zhuhai court of jurisdiction. From the outset, Euro-Pro knew that its manufacturing relationship was with Elec-Tech, the PRC manufacturer. The purpose of the project and the purchase orders, after all, was to manufacture steam ovens and vegetable choppers. ETI Hong Kong does not manufacture any products; nor does it have the capability of doing so. *Id.* ¶ 7. Euro-Pro's Statement of Claim to the AAA makes clear that its dispute is not about a specific invoice, but about Euro-Pro's alleged unhappiness with the product. Euro-Pro seeks some $18.5 million of damages as a result of the alleged failure to produce products which Euro-Pro claims are acceptable to it. None of that is a billing dispute with ETI Hong Kong, and no purchase order for $18.5 million exists.

Because arbitration is a matter of contract, the AAA's jurisdiction is dependent on the parties' agreement to arbitrate. Putting aside whether the boilerplate, including the arbitration clause at issue, is effective despite the fact that the parties never agreed to final terms, no agreement to arbitrate exists which vests the AAA with jurisdiction over ETI Hong Kong. ETI Hong Kong is not and never was responsible for manufacturing products for Euro-Pro and never agreed to arbitrate manufacturing disputes. On no less than three occasions, Elec-Tech identified itself, by its full corporate name and address, as Euro-Pro's contact for dealings concerning the project and manufacturing issues. By its actions, Euro-Pro confirmed its understanding of its manufacturing relationship with Elec-Tech. With a few unilateral exceptions by Euro-Pro, Euro-Pro properly issued tooling purchase orders to Elec-Tech, the entity that Euro-Pro knew would use the tooling for the steam oven and vegetable chopper. Not surprisingly, Euro-Pro also sent Elec-Tech authorization to use Euro-Pro's branding on the products and asked it to sign an agreement with a third-party product-testing service.

Putting aside the parties' communications, Euro-Pro knew that its manufacturing dealings were with Elec-Tech because its employees made site visits. On multiple occasions, Euro-Pro

sent some twenty employees, not to Hong Kong, but to Elec-Tech's production facility in Zhuhai.  Euro-Pro appears to claim that either because it issued several of its purchase orders to ETI Hong Kong or because ETI Hong Kong was the entity delegated to issue bills to Euro-Pro, ETI Hong Kong somehow agreed to arbitrate manufacturing disputes. That assertion is a non-sequitur.  No such arbitration agreement exists.

Because ETI Hong Kong did not agree to submit to arbitrate this dispute, the AAA simply has no jurisdiction over ETI Hong Kong, and the arbitration should be enjoined. *Societe Generale*, 643 F.2d at 869 ("Arbitration in Boston, not having been agreed to by the parties, should be enjoined.").

### 2. Euro-Pro's Boilerplate Attached to Certain Purchase Orders Does Not Vest the AAA with Jurisdiction over ETI Hong Kong.

No master agreement governing the project was ever finalized or executed.  Nor was the narrow arbitration clause in boilerplate attached to Euro-Pro's purchase orders ever finalized.  The boilerplate is not binding on either ETI Hong Kong (or Elec-Tech).  Even assuming *arguendo*, that the boilerplate terms attached to Euro-Pro's purchase orders are effective, the arbitration should still be enjoined.  A "gateway dispute" about "whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." *Awuah*, 703 F.3d at 41.  Euro-Pro's Statement of Claim posits a dispute that is not arbitrable.

The thrust of Euro-Pro's claim is that Elec-Tech failed to manufacture products "consistent with [Euro-Pro's] high quality standards and market reputation" and in time for the planned product launch.[1]  SOC ¶ 1.  For instance, the statement of claim alleges that Elec-Tech failed to meet Euro-Pro's technical specifications and to implement viable quality assurance and control procedures.  *Id.* ¶¶ 4, 22-23, 28-36.  Euro-Pro's dispute, at heart, is about Elec-Tech's allegedly deficient manufacturing of the products.  Bluntly put, ETI Hong Kong was not involved in manufacturing and not party to a manufacturing arrangement.

---

[1] For the purposes of this motion, Elec-Tech does not dispute Euro-Pro's claims concerning its high quality standards and market reputation.

Elec-Tech disputes Euro-Pro's claim. Putting the merits aside, the boilerplate attached to Euro-Pro's purchase orders would not render Euro-Pro's dispute arbitrable. That arbitration clause simply states that the parties submit to arbitration only disputes arising in connection from a particular purchase order. It does not authorize Euro-Pro to seek arbitration of disputes arising from the manufacturing project in general. To the contrary, the clause expressly states that "***all disputes shall otherwise be resolved in and only in federal or state court***, as is appropriate, in Suffolk County, MA." SOC ¶ 13 (emphasis added).

Although Euro-Pro attempts to root its claims in the purchase orders, both the terms of the purchase orders and Euro-Pro's statement of claim betray that attempt. For example, Euro-Pro appears to rely on a warranty in the purchase order that "for a period of 12 months following start of use or 18 months from receipt, the goods and services will be free from defects in materials and workmanship, merchantable and in full conformity with BUYER's specifications." But the purchase order, to which the boilerplate arbitration clause at issue was attached, only authorized Elec-Tech to acquire the tooling necessary to manufacture the CO650 steam oven. SOC at 19-20. The purchase order does not even deal with merchandise to be delivered to Euro-Pro.

Euro-Pro also claims that Elec-Tech's quality assurance and control procedures in manufacturing the CO650 steam oven failed to meet Euro-Pro's standards. SOC ¶¶ 28-36. As noted above, ETI Hong Kong was not involved in production, a fact known to Euro-Pro. It never agreed to arbitrate quality assurance and control issues. The Statement of Claim does not allege otherwise because it admits that Euro-Pro conveyed its "specifications" to Elec-Tech by email, in guidebooks, and at face-to-face meetings. SOC ¶¶ 28-30, 36. The very subject matter of the statement of claim to the AAA does not comport with the boilerplate Euro-Pro attached to its purchase orders.

## **CONCLUSION**

For the foregoing reasons, ETI Hong Kong respectfully requests that the Court grant its application for an order enjoining the arbitration proceeding captioned *Euro-Pro Operating LLC*

A/75850926

*v. Elec-Tech International (H.K.) Co. Limited*, case number 50 154 T 01059 13, pending before the International Centre for Dispute Resolution of the American Arbitration Association.

>Respectfully submitted,
>
>ELEC-TECH INTERNATIONAL (H.K.) CO. LIMITED,
>
>By its attorneys,
>
>/s/ Joseph L. Kociubes
>Joseph L. Kociubes, BBO #276360
>joe.kociubes@bingham.com
>Deana K. El-Mallawany, BBO #674825
>deana.el-mallawany@bingham.com
>**BINGHAM MCCUTCHEN LLP**
>One Federal Street
>Boston, MA  02110-1726
>617-951-8000

Dated:  December 13, 2013

## CERTIFICATE OF SERVICE

       I, Deana K. El-Mallawany, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that paper copies will be delivered to Euro-Pro Operating LLC's counsel, Kara E. Fay, Esq., Skadden, Arps, Slate, Meagher & Flom, One Beacon Street, Boston, MA 02108, on December 13, 2013.

                                                /s/ Deana K. El-Mallawany
                                                Deana K. El-Mallawany